Filed 7/23/14  In re P.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.A. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E059885 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J243174, J243175, J243176, J243177 & J243178) |
| v. | OPINION |
| M.A. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lily L. Sinfield, Judge.  Affirmed.

Hassan Gorguinpour, under appointment by the Court of Appeal, for Defendant and Appellant M.A.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant A.A.

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

The juvenile court terminated A.A.'s (Mother) and M.A.1's (Father) parental rights to their children. (Welf. & Inst. Code, § 366.26, subd. (c)(1).)[1] Father raises two issues on appeal. First, Father contends the juvenile court erred by denying Father's request to change a court order. (§ 388.) Second, Father contends the juvenile court erred by not applying the parent-child bond exception to termination. (§ 366.26, subd. (c)(1)(B)(i).) Mother raises one issue on appeal. Mother contends the juvenile court erred by not applying the parent-child bond exception to termination. (§ 366.26, subd. (c)(1)(B)(i).) We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A. BACKGROUND

Mother and Father (collectively, Parents) are married. Five of Parents' children are at issue in this case: (1) M.A., a male, born in 2005; (2) F.A., a female, born in 2006; (3) C.A., a male, born in 2007; (4) S.A., a female, born in 2008; and (5) P.A., a male, born in 2010. Parents and the five children lived together in an apartment in San Bernardino. Father is the presumed father of the five children. Parents have two other children, who reside with Mother's mother, in Arizona. Mother's mother is the legal guardian of the two older children. Parents abuse methamphetamine. Father suffers

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

from schizophrenia and bipolar disorder.  Father has a history of being held in custody due to being a danger to himself or others.  (§ 5150.)

The family has had seven referrals to the County of San Bernardino Children and Family Services (the Department) since 2007.  Three of the referrals were immediate response referrals, and two of those resulted in the children being removed.  There was also a referral in Arizona.  The two older children were removed from Parents' care in 2003.

In 2007, the family was referred to the Department because (1) the home was filthy, with cockroaches climbing the walls, (2) Parents were drug addicted, (3) the children had scratches on their faces, (4) Father was placed in custody for breaking the windows at their residence, and (5) Mother was arrested for child endangerment. Parents completed parenting classes, therapy, domestic violence classes, anger management classes, and substance abuse programs.  The case was dismissed on June 1, 2009.

B.     DETENTION

On March 1, 2012, San Bernardino Police Officers Martinez and Pahls were dispatched to Parents' apartment due to a fight taking place in the apartment—a neighbor heard an argument and contacted police.  When the officers arrived, Father answered the door.  Father was holding P.A.  P.A. was bleeding from a "large cut on his left foot," he had several marks and cuts on his face, swelling on his face, a large bump on his head, his eyes were closed, and he "seemed to be nonresponsive."  Father was bleeding from the top of his head.  Officer Martinez called for medical aid, and Officer

Pahls contacted the Department. The four other children were "running around in the apartment."

Parents consumed methamphetamine the morning of March 1. Parents' argument began when Mother went to a store, but returned home without food because there was not money on the EBT (Electronic Benefit Transfer) card. Father accused Mother of spending their money on drugs. Mother hit Father on his head with a broom or mop handle. Father was holding P.A. when Mother struck Father.

Inside the residence, Officer Pahls noticed trash and debris "almost completely covering the floor." Bloodstains were visible on the carpet and in front of the kitchen sink. Dirty dishes covered the countertops. There was no edible food in the freezer, refrigerator, or anywhere else in the apartment. The kitchen window was "broken out," and there was no electricity in the apartment. Father was arrested for child endangerment. (Pen. Code, § 273a.) Mother was arrested for domestic violence (Pen. Code, § 273.5), assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), and child endangerment (Pen. Code, § 273a). The Department took the children into protective custody.

Mother said P.A.'s foot was injured while she was at the store, and she did not know how the injuries occurred. Mother appeared to be under the influence of methamphetamine. Mother admitted (1) smoking $120 to $140 worth of methamphetamine that morning, (2) spending nearly $600 on methamphetamine that day, and (3) that the children had only eaten noodles for the past four days. Father said he was unaware of how P.A.'s foot was injured.

4

S.A. said P.A.'s foot was injured by glass, due to P.A. not wearing shoes. Mother was at the store and Father was in a different room when P.A. injured his foot. S.A. said C.A., the middle child, often scratches and punches P.A., which is how P.A. received his facial injuries. S.A. explained the bumps on P.A.'s head came from spider bites. S.A. had several scratches and scars on her body. S.A. explained the injuries were mostly caused by one of her siblings; however, one mark was caused by Mother whipping S.A. with a belt due to S.A. spilling water.

Mother admitted hitting Father approximately four times on his head during their fight, while Father was holding P.A. Mother also admitted striking S.A. when S.A. spilled water. Mother defended her actions by explaining the children hit Mother and "do mean things to her but nobody ever does anything about that." Mother pinches the children and sometimes "throws the kids when they get in her way."

P.A. was taken to the hospital. Doctors found P.A. had "numerous superficial wounds in various stages of healing on his face, chest, back, arms, and legs." P.A. also had the deep laceration on his foot that the police officers had noticed. Doctors saw a fresh bite mark on P.A.'s arm and two older bite marks on his back. Doctors could not determine if the bites came from an adult or a child.

The siblings said M.A. often bites P.A. Father said the children frequently "beat each other up." All the children had scratch marks. Father speculated that P.A.'s head was injured by C.A. because C.A. head butts "everybody." Father said he tries to stop the children from harming P.A., but the children are "'wild,'" and when Father leaves the room, P.A. gets "'jumped'" by his siblings. Father said he hit M.A.'s arm with a

5

broom when M.A. was harming one of the other children. Father was not taking his medication for his mental health issues at the time of the detention.

All the children were dirty. In regard to the children's hygiene, Father said F.A. would urinate on herself at night, but would not allow Father to change her underwear. Father said it had been "a couple weeks" since the children's clothes were washed. C.A. appeared the most groomed of the five children; however, his underwear was "severely soiled." After being removed from the home, the children were fed. All the children fought over the food.

Due to the children's "erratic and impulsive behaviors" the Department placed them in separate homes: the two girls, F.A. and S.A., were placed together in one home; two of the three boys, M.A. and C.A., were placed together in a second home; and P.A. remained in the hospital.

The Department filed a petition concerning P.A. alleging (1) P.A. suffered serious physical harm while in Parents' care and custody (§ 300, subd. (a)); (2) Parents failed to protect P.A. due to (a) engaging in domestic violence, (b) abusing drugs, (c) failing to resolve the issues that led to prior dependency cases, and (d) Father's history of section 5150 holds and "unstable mental health" (§ 300, subd. (b)); (3) P.A. suffered severe physical abuse (§ 300, subd. (e)); and (4) Parents were incarcerated and left P.A. with no provisions for support (§ 300, subd. (g)).

The Department filed four more petitions for the other four children. In those four petitions, the Department alleged Parents (1) failed to protect the children due to (a) engaging in domestic violence, (b) abusing drugs, (c) failing to resolve the issues

that led to prior dependency cases, and (d) Father's history of section 5150 holds and "unstable mental health" (§ 300, subd. (b)); (2) left the children without provisions for support (§ 300, subd. (g)); and (3) abused P.A., thus placing the siblings at substantial risk of suffering similar abuse (§ 300, subd. (j)).

The juvenile court found the Department established a prima facie case as to all five children. The juvenile court ordered the children continue to be removed from Parents' physical custody, but granted Parents one hour per week supervised visits, upon release from incarceration.

C.      JURISDICTION/DISPOSITION REPORT

P.A. was placed in the same foster home as his brothers, M.A. and C.A. The female children continued to reside in a separate foster home. Parents were released from jail. M.A. and C.A. harmed themselves: they scratched their own faces, threw themselves on the floor, C.A. hit the side of his head with his fists, and M.A. rubbed his face on the floor which left scratches. M.A. and C.A. "w[o]ke several times a night with nightmares."

M.A., who was seven years old, was not trained to use a toilet. It appeared that, in addition to epilepsy, M.A. suffered from autism or attention deficit hyperactivity disorder (ADHD). M.A. had developmental delays. M.A. did not speak much and primarily pointed, grunted, and yelled. M.A. could not speak in full sentences and constantly wanted to eat. M.A. punched, bit, and kicked others and himself.

7

F.A. was "covered" in scratches and healing scars. F.A. fought with her sister, S.A.; they hit and pushed one another. F.A. constantly wanted to eat. C.A. suffered from a congenital urinary condition; Parents never had the condition surgically repaired. C.A. had multiple scratches in different stages of healing. C.A. did not speak much and mostly grunted, pointed, and yelled. C.A. constantly wanted to eat. S.A. was "covered in scratches and healing scars." S.A. constantly wanted to eat. P.A. had stitches for the wound on his foot, but it was healing. P.A. appeared to be a happy baby.

The Department's original jurisdiction/disposition report was filed on March 22, 2012. In that report, the Department recommend Parents receive reunification services. The jurisdiction/disposition hearing was continued to allow the Department to provide proper ICWA notice. On May 3, 2012, the Department filed an addendum report. In the addendum report, the Department recommended the juvenile court deny reunification services for Parents.

The addendum report reflected a bone survey was conducted on P.A., which reflected the child suffered Thwarted Growth Syndrome, which results from chronic and severe neglect. "The bone pattern suggests that the bones start and stop growing as the child moves in and out of survival mode." The Department asserted that P.A. suffered severe physical abuse (§ 361.5, subd. (b)(5)) at the hands of his siblings due Mother's and Father's neglect.

The Department noted Mother had twice relapsed into abusing drugs, but had been sober for two weeks; Father had been sober since his release from jail. Parents were enrolled in reunification services and regularly participating. During two of the

visits, Parents "lost control of the visit," and the children would not listen to Parents. However, the two most recent visits were positive. The children were "genuinely excited to see their parents and their siblings." The social worker opined, "The children are bonded to the parents." The social worker noted F.A. "has difficulty at the end of every visit when she has to say goodbye." The social worker concluded that while the children share a "strong bond" with Parents, it would be detrimental to return the children to their parents due to the various injuries the children suffered in Parents' care, which resulted from neglect.

The Department filed a second addendum report on May 24, 2012. The Department again recommended the juvenile court deny reunification services to Parents. The second addendum report reflected that in addition to neglect, the children suffered physical and sexual abuse while in Parents' care. In particular, F.A. was sexually abused.

A report from the Children's Assessment Center reflected M.A. sexually abused F.A. At night, when the children were watching television, M.A. fondled F.A.'s vagina with his hand. The fondling hurt F.A. and caused her to have pain when she urinated. F.A. said the molestation happened "'[a] lot.'" F.A. told her aunt about the molestation, and the aunt told Mother who responded by locking M.A. in his room.

In regard to physical abuse, C.A. said he saw Mother (1) hit S.A.'s head with a belt, (2) hit P.A.'s buttocks with her hand, leaving red marks, and (3) hit P.A.'s head and "'wee wee.'" Mother also struck C.A. with a belt on his arm, stomach, hand, and foot. C.A. said M.A. scratches C.A.'s back and bites C.A.'s arm. F.A. reported that

9

Mother scratched F.A.'s chest and spanked her buttocks. F.A. witnessed M.A. calling P.A. "a 'bitch and dumb ass' and dropping him on the kitchen floor." There was glass on the kitchen floor, and P.A. cried when dropped. F.A. had seen M.A. bite P.A.'s arm and S.A.'s back. M.A. scratched C.A.'s back, P.A.'s head, and S.A.'s neck. During one incident, M.A. scratched C.A.'s back with a knife. F.A. also described "'starving'" and not having any food in the house. S.A. had numerous scars on her face and body. C.A. also had numerous scars on his face and body. M.A. described seeing Father hit F.A.'s head with a hammer.

The Department filed first amended petitions. The first amended petition concerning P.A. and S.A. reflected allegations of (1) serious physical harm (§ 300, subd. (a)), (2) failure to protect (§ 300, subd. (b)), and (3) severe physical abuse (§ 300, subd. (e)). The first amended petition related to C.A., F.A., and M.A. set forth allegations of (1) serious physical harm (§ 300, subd. (a)), and (2) failure to protect (§ 300, subd. (b)).

The jurisdiction and disposition hearing took place on July 24, 2012. At the hearing, the Department said it had reached an agreement with Parents. The Department agreed to dismiss the allegations of severe physical abuse (§ 300, subd. (e)) and provide reunification services; Parents agreed not to contest the allegations of (1) serious physical harm (§ 300, subd. (a)), and (2) failure to protect (§ 300, subd. (b)).

The juvenile court found true all of the (1) serious physical harm (§ 300, subd. (a)), and (2) failure to protect (§ 300, subd. (b)) allegations. The juvenile court dismissed the severe physical abuse (§ 300, subd. (e)) allegations. The court granted

10

Parents one hour per week of supervised visitation with the children.  The court ordered reunification services, per the agreement between the parties.

D.    SIX-MONTH REVIEW

The boys continued to reside in a separate foster home from the girls.  Father enrolled in ITT Technical School and was working for Labor Ready "sometimes during the week."  Father was engaged with the children during visits, and participated in services.  Father completed outpatient substance abuse treatment and parenting classes.  Father said he remained sober, but said it was difficult because Mother used methamphetamine on September 4, 2012—Father had a hard time staying sober when Mother used drugs.  Father failed to take a drug test on January 10, 2013.

Mother had one positive drug test for methamphetamine on June 27, 2012.  Mother failed to take drug tests on December 19, 2012, and January 14, 2013.  Mother said she used drugs after seeing Father use drugs, in other words, Father also allegedly relapsed.  Mother attended three months of domestic violence classes during a six-month period, which the social worker believed was an inadequate amount of classes.  Mother visited the children, but was not as engaged during the visits as Father.  The social worker believed there was not an attachment between the children and Mother.  The social worker found it problematic that Parents were homeless and did not have stable employment.

At the visits, the first 20 minutes went "well," but then the children "bec[a]me bored or restless."  Neither parent appeared to have control over the children.  Mother would "sit back and allow the children to do whatever they want," while Father would

loudly speak to the children "over and over again" in an attempt to get their attention. During the visits, the children appeared to "revert back to the life they lived when living with the parents." For example, the children fought over toys.

M.A. was diagnosed as having ADHD and suffering seizures. M.A. had a mild intellectual disability. M.A. was performing better in school with his ADHD medication. C.A. had surgery to repair his urination issue. C.A. was developmentally behind other children his age, but was not handicapped. F.A. was also developmentally behind children her age and had trouble retaining information taught in school. A meeting at F.A.'s school resulted in the decision to leave F.A. in the first grade— holding her back one year. S.A. also appeared to be slightly delayed. S.A. could not attend preschool because she was not potty trained.

The boys, M.A., C.A., and P.A., liked their foster families and were adjusting well to their placement. The boys referred to their foster parents as "'Mommy and Daddy.'" The girls, S.A. and F.A., were also adjusting well to their foster home. The girls referred to their foster parents as "'Mommy and Daddy.'" The girls were learning new skills and getting along better with one another. F.A. displayed nervousness and anxiety for three days following visits with Parents. For example, F.A. would hide under her desk at school until her foster father arrived. F.A. would also act out sexually—touching S.A. when they were alone together, and placing toys on top of one another and simulating intercourse.

In the written report, the Department recommended Parents continue to receive reunification services. However, at the hearing on November 1, 2012, the court

explained the Department had changed its recommendation to terminating services and scheduling a hearing to terminate parental rights. The Department explained that the recommendation changed because Parents were not actively engaged in their case plan, abused drugs during the reporting period, and lacked stable housing. The juvenile court scheduled the matter for December 17 for mediation and a contested hearing, in case the mediation failed.

On December 17, the juvenile court noted Father failed to take a drug test on December 6; however, the failure was "employment related." Father obtained an internship, but it was unclear if the internship would lead to employment. The court explained that its "sense of this case is that it's drifting." The court also expressed concern that "the visits aren't going well. They are chaotic. The mother seems to be completely disengaged from the visits . . . and the father is having a hard time managing with all the children." The court noted that a pediatrician and therapist both recommended the visits be terminated because they were "worsening [the children's] condition." The juvenile court concluded Parents "love the children," but they did not appear to be making the necessary progress. The juvenile court continued the matter until January 28 because reports were missing and Parents did not have any documents to show their progress.

On January 28, the Department explained it still held the position Parents were not fully engaged in services and were not benefitting from the services. The Department asserted it was not in the children's best interests to continue providing services to Parents. Parents said they would be willing to participate in an inpatient

13

drug treatment program.  The court found that Parents had been participating in services:  they completed parenting classes, participated in therapy, and attended domestic violence and child endangerment classes.  The Department asserted Mother's report from the classes reflected she did not often accept responsibility or display empathy.  The court found Parents were "still fighting the substance abuse," and that they should be given an opportunity to participate in an inpatient treatment program.

The court proceeded with the contested hearing.  Father testified that he sometimes was able to obtain work through temporary staffing agencies and sometimes he takes day jobs that pay cash.  Father said he and Mother were living with a friend.

Father admitted he raised his voice at the boys' foster mother during a visit.  Father said the foster mother was supervising the visit, but Father wanted her to move out of P.A.'s line of sight, so that P.A. would not cry for the foster mother.  The foster mother refused to move from the doorway, where she watching the visit, and P.A. cried for an hour, so Father raised his voice.  Father denied security was called or that he threw a chair.  Father said he was taking medication for depression.

Mother testified at the hearing.  Mother said she last abused drugs three days before the hearing.  Mother said she lied in the past (around September 4, 2012) when she said Father triggered her relapse by using drugs; Mother said Father did not use drugs as she had previously claimed.  Mother had been applying for jobs, but remained unemployed.  Mother had last applied for a job two weeks prior to the hearing.

The social worker also testified at the hearing.  The social worker explained that Parents were offered inpatient substance abuse treatment at the beginning of the case,

but they refused it. The social worker explained the Department would not pay for inpatient treatment at this point because Parents had refused it earlier in the case. The social worker found Mother was engaging more with the children during the past two visits; however, Mother had failed to react when P.A. climbed on top of a table and the social worker had to tell Mother to move him off the table.

The social worker explained that she believed services should be terminated because the visits caused the children to regress into their old behaviors. The children suffered from posttraumatic stress disorder and visiting Parents was a trigger for the children. The social worker noted that the incident involving F.A. hiding under a desk occurred after the visit wherein Father confronted the boys' foster mother. Additionally, after that visit C.A. became angry at his foster mother, tossed a chair back, and "swung at her"—modeling Father's behavior.

The social worker further testified that Father called her the Thursday before the hearing saying he and Mother needed a place to live because they could no longer stay at their friend's home. The social worker explained it was problematic trying to find housing for the parents because they had no income. The social worker did not believe Parents would benefit from additional services because they had services in their prior California case, but the problematic behaviors occurred again.

The court took a recess because one of the attorneys was needed immediately in another department. When the case resumed, the court said the matter had been resolved. The Department agreed to provide Parents with services until the date of the termination hearing, which was May 1, 2013. The court determined Mother would be

15

ordered to participate in an inpatient drug treatment program, and Father would be required to be assessed for inpatient drug treatment. If Father was not accepted to an inpatient program, then he would have to at least participate in an outpatient program. The court also ordered the visits take place in a therapeutic setting.

E.      12-MONTH REVIEW

Parents were in inpatient drug treatment. Mother was at the Inland Valley Recovery Services Drug Treatment Program. Mother said she was afraid to leave the program because she thought she would relapse. Mother was supposed to leave the program on May 7. On April 27, Mother was terminated from the program due to fraternizing with a male resident. A psychological report reflected Mother had "'below average understanding of child developmental needs and/or child rearing techniques.'" The psychologist recommended the children not be placed in Mother's care.

Father was at Gibson House for Men and was being transitioned to the "living section of the program where he may go out into the community for [a] job search." Father said he had been applying for jobs, but had not received any offers. Ultimately, Father was terminated from the drug treatment program on May 3, when he left to spend time with Mother. Neither Mother nor Father had plans for stable housing or employment.

The visits with the children took place in a therapeutic setting, but were "chaotic." The children fought for attention, manipulated, and threw tantrums to "get their way." However, the therapist noted there was "an apparent bond of love between these children and their parents."

F.A. and S.A. were doing well in their foster placement. The boys were also doing well in their foster placement. P.A. was 28 months old, but was developmentally at the stage of a 17-month old. A neuro-developmental report reflected if P.A. were placed in a stressful, neglectful, abusive, or chaotic environment then his "negative functioning will be cemented." P.A. needed a safe, predictable, and nurturing environment in order to resolve his developmental issues.

The Department recommended the parents' services be terminated because the parents did not have jobs or housing and Mother feared relapsing. The juvenile court found placing the children in Mother's and Father's custody would be detrimental to the children's welfare and best interests. The court also found Parents failed to make substantive progress in their case plans. As a result, the court terminated reunification services and scheduled a hearing to consider terminating parental rights. The court granted Parents one hour per week supervised visits with the children.

F.      TERMINATION AND REQUEST TO CHANGE A COURT ORDER

M.A. was diagnosed with autism, ADHD, and adjustment disorder. M.A. had an appointment to see an audiologist, due to a history of untreated ear infections. M.A. was seeing a speech therapist due to suffering speech and language delays. M.A. was attending special education classes. M.A. suffered anxiety and was concerned about being removed from his foster home. M.A. worried about eating enough food.

C.A. had self-harming behaviors, was aggressive with his siblings, suffered nightmares, and was "emotionally unstable." C.A. was receiving speech therapy due to suffering speech and language delays. C.A. was attending special education classes.

C.A. appeared to suffer from posttraumatic stress disorder. He worried about being removed from the foster home and not having enough food.

P.A. had speech and language delays. P.A. was also socially delayed. It appeared P.A. may suffer from fetal alcohol syndrome. P.A. worried about being removed from his foster home and not having enough food.

F.A. suffered speech and language delays. F.A. was two years behind academically and was attending special education classes. F.A. was anxious and aggressive, but appeared attached to her foster parents.

S.A. suffered "severe cognitive delays." S.A.'s speech and language were so delayed that it was difficult to have a conversation with her. S.A. attended special education classes. She had difficulty following direction and "lack[ed] the ability to understand most of the world around her."

The children's foster parents were interested in adopting them. All the children said they wanted to stay in their foster homes. Mother's and Father's visits with the children went well for the first 20 minutes, but then became chaotic. The foster parents reported it was difficult "settling down the children for about 3 days after each visit."

Father filed a request to change a court order. Father asserted circumstances had changed because he was living at the Salvation Army Transitional Living Center and participating in individual counseling, career counseling, budgeting, substance abuse treatment, alcohol and drug testing, crisis intervention, self awareness classes, and domestic violence classes. Father also asserted he was employed. Father requested the children be returned to his custody or, in the alternative, that services be reinstated and

18

he be granted unsupervised overnight and weekend visits. Father alleged the requested change would be in the children's best interests because Father "love[s his] children very much and believe[s] that they should be raised by their father."

A letter from the Salvation Army reflected Parents were both living at the transitional living center, which involved an 18-month to two-year program. The children would be permitted to live at the center as long as they all complied with the various rules. Parents were "adjusting to the program," they were participating in classes and performing their required chores. Parents moved into the center on July 31, 2013; the letter was dated September 5, 2013. So, Parents had been living at the center for approximately five weeks.

The Department opposed Father's request. From June 1 to June 3, 2013, Father left the social worker 19 voicemail messages. In the messages, Father said Mother and others were trying to kill him, and that he and Mother had been "smoking [m]eth" throughout the dependency case. The social worker believed Father was high from drug use, delusional, and/or suffering a mental breakdown.

The Department further asserted the children's behavior was very different with Parents than with the foster parents. With Parents, the children hit and scratched one another. During one visit, when the boys were waiting for their sisters to arrive, the boys were climbing and jumping on chairs. Mother sat passively, and the foster mother intervened to stop the boys. The Department noted Father tried to instruct the children, but appeared overwhelmed. The Department expressed two concerns: (1) all the children have special needs that require therapy and constant supervision, and those

19

needs would be "challenging to the most skilled parents," but Parents had shown they could not properly supervise the children for an hour during visits; and (2) if the children were returned to Mother's and Father's care, then Mother would be caring for the children while Father worked, and Mother did not demonstrate an ability to properly care for the children by herself. The Department requested Mother's and Father's visits with the children be reduced to one hour per month, due to the negative impact the visits had on the children.

On October 23 and 24, the juvenile court held a combined hearing for Father's request to change a court order and termination of parental rights. Mother testified at the hearing. Mother said she had been sober for nine months. Mother said she was still living at the Salvation Army Transitional Living Center. Mother explained that the Salvation Army program was different than other services she had participated in because it helped her realize she is "better off" being sober, which she had not previously realized. Mother said she would maintain her sobriety after leaving the center by obtaining a sponsor and going to Narcotics Anonymous meetings. Mother explained her life was different now because she obtained a full-time janitorial job at a warehouse, which kept her busy; Mother's last job was in 2006.

Mother was also learning how to control her anger and violent tendencies. Mother explained that Father was also still living at the Salvation Army Transitional Living Center, and that they were happier and having fun together "like a family." Mother asserted the visits with the children were not chaotic. Mother said she played with the children during visits. Mother explained the "brothers like to pick on" M.A.,

but Mother tells them to stop, and then they stop. Mother agreed that Father was better at controlling the children during visits.

Mother said the children "always ask for daddy" during the visits. Mother said she sometimes asks F.A. about school, but F.A. does not want to talk to Mother about it. Mother explained that F.A. will draw pictures of Mother and tell Mother that she loves her. Mother said the children run to her every time they see her. Mother said the children want to live with Parents.

Father also testified at the hearing. Father said he had been sober for nearly two years. Father performed full-time janitorial and maintenance work at a warehouse. Father said his work hours vary, sometimes he works eight hours per days, while other times he works 15 hours per day. Father explained the Salvation Army program was different than the other programs he had previously participated in because this program gave him self-confidence and a job that kept him busy. Father said he was saving money and waiting for "section 8" housing to become available, so that he would have his own home, outside of the Salvation Army Transitional Living Center; although the children could also live at the center. Father said the children ran to him during visits and told him they loved him. Father said F.A. or S.A. would sometimes cling to Mother or Father at the end of the visits.

Father testified that he was diagnosed as bipolar and schizophrenic, but was not taking any medication for his mental health. Father was not seeing a doctor for his mental health conditions. Father explained the last time he went to a doctor, he was told he no longer needed medication, but it was a "regular" doctor, not a specialist; Father

21

also suffered from diabetes, so it is unclear what medication was no longer needed. Father said another reason he was not taking medication was that he did not have medical insurance. However, Father recently received health insurance as part of his job, so he might start taking medication again.

Father admitted making 19 calls to the social worker in June, but said he was "distraught" and "angry" over the children being taken away from him. Father believed he had been off his medication for three or fourth months when he made the telephone calls. When Father made the telephone calls, he did not actually believe people were trying to kill him; Father denied saying anything about Mother and himself using drugs. Father admitted having two section 5150 holds in the past. Father testified that M.A. was diagnosed with epilepsy, autism, and ADHD, but the other children were "normal" and did not have any developmental issues.

The social worker also testified at the hearing. The social worker explained that in Father's voicemails, he admitted that he and Mother had been abusing methamphetamine throughout the dependency case and said he believed people were trying to kill him. The social worker believed Father was suffering a mental breakdown or was under the influence of drugs.

In regard to visits, it appeared to the social worker that Father had more control over the children than Mother. When Mother would focus on one child, another child would start climbing the furniture; Mother could not control all five children at once. During one visit, in October 2013, Mother grabbed P.A. by his arms and shook him. When Mother looked over at the social worker supervising the visit, she put P.A. down.

The social worker explained that Father has to sit in front of the doorway of the visitation room during the visits, in order to stop the children from running out of the room. The children would try to leave the room to visit the social worker, who was outside the room.

The social worker explained that when the boys were at home with their foster parents, they were "different children." For example, the children were calm, watching television or doing yard work; they were not "loud and rambunctious." The girls appeared attached to their foster parents. The social worker believed the children shared a "small" bond with Parents. The children told Parents they loved them in response to Parents saying they love the children, but the children did not initiate saying "I love you" to the parents. The social worker opined the children enjoyed playing at the visits, but were ready to return to their foster homes when the visits ended. The social worker based her opinion on the children not crying or holding on to the parents at the end of the visits.

The adoption worker also testified at the hearing. The adoption worker believed the boys had a very close parent-child bond with their foster mother.[2] The boys had been living with their foster mother for 19 months. The boys' foster mother wanted to adopt the boys. The girls' foster parents were also interested in adopting the girls. The children's foster parents had made arrangements for visitation between the children after adoption.

---

[2] The boys' foster father was murdered during the pendency of this case.

The adoption worker supervised visits between the children and Parents. The adoption worker found the visits chaotic. Parents mostly interacted with the children by pulling them off one another, rather than playing with the children or interacting in a more positive way.

In regard to Father's request to change a court order (§ 388), the juvenile court found the parents had improved their interactions with the children over the course of the case. The court concluded Mother's and Father's circumstances were *changing*, but not *changed.* The court explained Parents were just completing their anger management course and still waiting to receive section 8 housing. In regard to the children's best interests, the juvenile court found there were mental health issues related to Father that needed to be addressed, as evinced by the 19 voicemail messages. The court noted that Father stopped taking medication for his bipolar condition and schizophrenia despite mental health progress being part of the case plan.

The juvenile court further explained it was problematic that Parents never had unsupervised visits with the children or taken any other steps toward transitioning the children back into Mother's and Father's care. The court concluded the law did not allow for waiting another six months to a year to determine if Parents would be ready to care for the children. The court said, "I can't, at this point, based on the evidence presented in the visits, feel comfortable knowing that the children will be safe." The court denied the request to change a court order. (§ 388.)

In terms of the parent-child bond exception to termination, the juvenile court found Parents had regular visits with the children, which satisfied the first prong. As to

24

the second prong, which concerns the benefit to child, the juvenile court found Parents were more friendly visitors to the children than parents. The juvenile court also found the children were "being very well cared for" in their foster homes/prospective adoptive homes. Thus, the court concluded the relationship with Parents was outweighed by the benefit the children would gain from being adopted. The juvenile court terminated Mother's and Father's parental rights to the children.[3]

## DISCUSSION

### A. FATHER'S APPEAL

#### 1. REQUEST TO CHANGE A COURT ORDER

Father contends the juvenile court erred by denying his request to change a court order. (§ 388.)

Under section 388, a parent may petition a juvenile court to modify a previous order on the grounds of changed circumstances. (§ 388; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.) The petitioner has the burden to show, by a preponderance of the evidence, a change of circumstances, and to show that the proposed modification is in the child's best interests. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; Cal. Rules of Court, rule 5.570(h)(1).) "We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. [Citations.]" (*B.D.*, at p. 1228.)

---

[3] The reporter's transcript reflects the juvenile court said, "[T]he love and commitment to those children [from the foster parents] does not outweigh the parents' relationship the biological parents that is." We infer the juvenile court misspoke and intended to say the foster parents' commitment *did* outweigh the parents' relationship with the children.

25

In regard to changed circumstances, the change must be substantial. (*In re Heraclio A.* (1996) 42 Cal.App.4th 569, 577.) The juvenile court found Father's circumstances were changing, but had not changed. The juvenile court could reasonably make this conclusion given that (1) Father had not shown he could maintain a job and stable mental health outside of a structured environment, such as that provided by the Salvation Army; (2) Father had not had unsupervised visits with the children, so it was unclear how he would interact with the children if he were unsupervised; (3) in June 2013, Father left multiple messages for the social worker, reflecting possible drug use or unstable mental health; and (4) Father had not been taking medication for his mental health problems. Given the various issues that were still in flux or had not been resolved, the juvenile court could reasonably conclude Father's circumstances had not changed in a meaningful way.

The best interests of the child are determined by considering (1) the seriousness of the problem that led to the dependency; (2) the strength of the parent-child bond; and (3) whether the problem that led to the dependency has been resolved, or the ease with which it may be resolved. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685.)

We begin with the seriousness of the problem. At the jurisdiction/disposition hearing, the juvenile court found true all of the (1) serious physical harm (§ 300, subd. (a)), and (2) failure to protect (§ 300, subd. (b)) allegations. Accordingly, the court found true the allegations that (1) Father has a substance abuse problem that impairs his ability to properly care for the children, and (2) Father has a history of section 5150 commitments and unstable mental health. The juvenile court could reasonably conclude

26

the problems were serious in that they resulted in the children being neglected by Father, which led to abuse by the siblings.

Next, we address the bonds between the children and Father. Father regularly visited the children and the children appeared happy to see him. However, the children were also happy to see the social worker, and the children were not particularly sad at the end of the visits. Additionally, the social worker opined that the children regressed into their old behavior during visits because they suffered from posttraumatic stress disorder, which was triggered by seeing Parents. The children were not particularly emotional upon greeting or leaving Father, and the visits with Father appeared to traumatize the children. Given the foregoing evidence, the juvenile court could reasonably conclude the bonds between children and Father were not strong.

We next address the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. The problems, as set forth *ante*, are Father's drug abuse and unstable mental health. The hearing for the request to change a court order took place in October 2013. In June 2013, Father left 19 voicemail messages for the social worker. In the messages, Father said Mother and others were trying to kill him, and that he and Mother had been "smoking [m]eth" throughout the dependency case. The social worker believed Father was high from drug use, delusional, and/or suffering a mental breakdown.

Father testified that he was diagnosed as bipolar and schizophrenic, but was not taking any medication for his mental health. Father was not seeing a doctor for his mental health conditions. Father believed he had been off his medication for three or

four months when he made the telephone calls.  In October, Father had recently received health insurance as part of his job, so he thought he might start taking medication again.  Father also admitted having two section 5150 holds in the past.

Assuming Father was sober at the time he left the voicemail messages, the juvenile court could reasonably conclude the messages reflected Father's mental health was not stable.  Even if Father did not believe people were actually trying to kill him at the time he left the messages, the messages reflect an unstable individual in that Father repeatedly called the social worker, claiming he was about to be murdered.  Given Father's past mental health holds, it appears that the mental health issue would not be easily resolved because it is a long term issue.  Additionally, Father was unclear on whether he believed he needed medication.  Father thought a doctor told Father he may no longer need medication, but Father also explained he stopped taking the medication due to a lack of insurance.  Thus, it is unclear how easily Father's mental health could be stabilized given Father's history of problems and uncertainty regarding medication.

In sum, the juvenile court could reasonably conclude (1) there were not changed circumstances; and (2) the requested change would not benefit the children because (a) the children did not have a strong bond with Father, and (b) it could be difficult to resolve Father's mental health issues.  Accordingly, we conclude the juvenile court did not abuse its discretion.

28

## 2. *PARENT-CHILD BOND EXCEPTION*

Father contends the juvenile court erred by not applying the parent-child bond exception to terminating parental rights.

If a juvenile court finds a dependent child is adoptable, then it will terminate parental rights unless one of the statutorily enumerated exceptions is applicable. (§ 366.26, subd. (c)(1).)  One of the enumerated exceptions provides that parental rights shall not be terminated if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

There is a split of authority as to which standard of review is applicable to a decision to not apply the parent-child bond exception—(1) substantial evidence; (2) abuse of discretion; or (3) a hybrid of substantial evidence and abuse of discretion. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 [Fourth Dist., Div. Three applied the substantial evidence standard]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [Fourth Dist., Div. One applied the substantial evidence standard]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [First Dist., Div. Three applying the abuse of discretion standard]; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449 (*Aaliyah R.*) [Second Dist., Div. Eight applying the abuse of discretion standard]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [Second Dist., Div. Seven applying the hybrid standard]; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [Sixth Dist. applying the hybrid standard].)

Under the hybrid standard, the issue of whether a beneficial parent-child relationship exists is reviewed under the substantial evidence standard of review, while the abuse of discretion standard applies to the issue of whether the child would benefit from continuing the relationship. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 622.) Father and Mother advocate for this court to apply the hybrid standard, so we will do so for purposes of this case, as the result will be the same under any of the standards.

The juvenile court found Father's visits with the children were consistent. Accordingly, we focus on the "benefit" prong of the analysis. "The benefit to the child from continuing such a relationship must . . . be such that the relationship '"promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."' [Citation.]" (*Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 449.)

When the children visited Parents they reverted to their prior behaviors of fighting with one another and creating chaos. After visiting with Parents, it would take the children several days to calm down and return to well-behaved states. During the visits, Parents mostly interacted with the children by pulling them off one another, rather than playing with the children or interacting in a more positive way. The social worker explained that Father has to sit in front of the doorway of the visitation room during the visits, in order to stop the children from running out of the room. The social worker opined the children enjoyed playing at the visits, but were ready to return to their foster homes when the visits ended. The social worker based her opinion on the children not crying or holding onto the parents at the end of the visits.

30

The evidence reflects the visits with Father actually harmed the children, since the children "revert[ed] to [their] old behaviors" upon seeing Father. While the children may have enjoyed seeing Father and playing, it does not appear the interaction was building a strong relationship, since Father spent most of his time pulling the children off one another or stopping them from running out of the visitation room. Accordingly, we conclude substantial evidence supports the juvenile court's finding that the children did not have a beneficial relationship with Father.

Further, in regard to the caretakers, during a visit with Parents, P.A. cried because he wanted to be with his foster mother. The social worker explained that when the boys were at home with their foster parents, they were "different children." The boys were calm, watching television or doing yard work; they were not "loud and rambunctious." The girls appeared attached to their foster parents. The children resided with the foster parents for 19 months and referred to them as "'Mommy and Daddy.'" It appeared to the social worker that after visits, the children were ready to return to their foster homes.

The juvenile court could reasonably conclude from the foregoing evidence that the children shared a strong parent-child bond with the foster parents because the children treated their foster parents as parents. The children calmed down and did chores when they were with their foster parents, showing the foster parents played a parental role. The children also appeared to go to the foster parents for comfort, as shown by P.A. crying for his foster mother and the children being ready to return to

their foster parents after visits with Parents. The foregoing evidence reflects the children were capable of being calm and productive when away from Father.

Given the evidence of (1) the positive relationship between the children and other caretakers, and (2) the evidence of the harm the visits with Father caused the children, the juvenile court could reasonably conclude continuing the relationship with Father did not outweigh the well-being the children would gain in a permanent home with new, adoptive parents. Accordingly, we conclude the juvenile court did not abuse its discretion.

Father asserts the children shared a strong bond with him. In support of this assertion, Father cites reports from the Department and a therapist who indicated Father had a "'strong bond'" and "'bond of love'" with the children. Father's argument is not persuasive because we cannot reweigh the evidence. (*In re C.B.* (2010) 190 Cal.App.4th 102, 127.) As set forth *ante*, the juvenile court's relationship finding was supported by substantial evidence. (*Ibid.* [under the substantial evidence standard we view the record in the light most favorable to the juvenile court's order even if other evidence supports a contrary conclusion].)

Father contends the juvenile court erred by relying on an improper factor in weighing (1) the benefit the children would receive from continuing their relationships with Father against (2) the well-being the children would gain from being in a permanent home with new, adoptive parents. Father asserts the juvenile court incorrectly considered the specific foster parents' abilities to "meet the children's day-to-day needs" and their "commitment" to the children, such as taking the children to

32

various therapy appointments. Father asserts the weighing process should not involve the specific foster parents' commitment to the children and therefore the juvenile court erred. In other words, Father asserts the juvenile court should not have considered the children's well-being in these particular foster homes—it should have been a more generic adoption possibility that was considered.

When the juvenile court explained its reasoning, the court said, "I think, also for the purpose of the record in terms of the best interest prong fo[r] the children and the beneficial relationship, the social worker's testimony, which I also find credible in terms of the children's state in their current prospective adoptive homes, I think the children are being very well cared for. [¶] It sounds like the prospective adoptive parents are very proactive in engaging in the services needed for the children and seeking out those services and committing to the permanency of the children. And, it does appear from this court's perspective, that the love and commitment to those children does not [*sic*] outweigh the parents' relationship the biological parents that is."

As set forth *ante*, when analyzing the "benefit" prong, a court must consider whether the benefit the child would receive from continuing the relationship with the biological parent "'"promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."'" [Citation.]" (*Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 449.)

The juvenile court described the love and care the children would receive if adopted by their prospective adoptive parents. In that discussion, the juvenile court was considering the "well-being" of the children. While the court described the well-being

33

factor in terms of the specific prospective adoptive parents, the comments can be understood to apply to the larger adoptive pool, in that there were possible adoptive families who would provide the children with love, stability, and services for their special needs. Such that, if these prospective adoptive homes became unavailable, there were people, in a larger sense, who could provide the children with a sense of well-being that would outweigh the well-being gained from continuing the parent-child relationship. Accordingly, we are not persuaded that the juvenile court relied on an improper factor.

B.      MOTHER'S APPEAL

Mother contends the juvenile court erred by not applying the parent-child bond exception to termination. (§ 366.26, subd. (c)(1)(B)(i).)

As set forth *ante*, Mother advocates for application of the hybrid standard of review. Therefore, we apply the hybrid standard, since the result will be the same under any of the three possible standards. The juvenile court found Mother's visits with the children were consistent. Accordingly, we focus on the "benefit" prong of the analysis. "The benefit to the child from continuing such a relationship must . . . be such that the relationship '"promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."' [Citation.]" (*Id*. at p. 449.)

When the children visited Parents they reverted to their prior behaviors of fighting with one another and creating chaos. After visiting with Parents, it would take the children several days to calm down and return to being well-behaved. During the visits, Parents mostly interacted with the children by pulling them off one another, rather than playing with the children or interacting in a more positive way. During a visit in October 2013, Mother grabbed P.A. by his arms and shook him. When Mother looked over at the social worker supervising the visit, she put P.A. down. The social worker opined the children enjoyed playing at the visits, but were ready to return to their foster homes when the visits ended. The social worker based her opinion on the children not crying or holding onto the parents at the end of the visits.

It appears the visits with Mother harmed the children, since the children "revert[ed] to their old behaviors" upon seeing Mother. While the children may have enjoyed seeing Mother and playing, it does not appear the interaction was building a bond, since Mother spent her time pulling the children off one another. Accordingly, we conclude substantial evidence supports the finding the children did not have a beneficial relationship with Mother.

Further, in regard to the caretakers, during a visit with Parents, P.A. cried because he wanted to be with his foster mother. The social worker explained that when the boys were at home with their foster parents, they were "different children." The boys were calm, watching television or doing yard work; they were not "loud and rambunctious." The girls appeared attached to their foster parents. The children resided with the foster parents for 19 months and referred to them as "'Mommy and Daddy.'"

35

It appeared to the social worker that after visits, the children were ready to return to their foster homes. The children calmed down and did chores when they were with their foster parents, showing the foster parents played a parental role. The children also appeared to go to the foster parents for comfort, as shown by P.A. crying for his foster mother and the children being ready to return to their foster parents after visits with Parents. The foregoing evidence reflects the children were capable of being calm and productive when placed with different caretakers.

Given the evidence of (1) the positive impact other caretakers, e.g., foster parents, had on the children, and (2) the evidence of the harm the visits with Mother caused the children, the juvenile court could reasonably conclude continuing the relationship with Mother did not outweigh the well-being the children would gain in a permanent home with new, adoptive parents. Accordingly, we conclude the juvenile court did not abuse its discretion.

Mother contends the juvenile court erred because there is evidence the children love Mother and the Department found the children were bonded to Mother. Mother's argument is not persuasive because we cannot reweigh the evidence. (*In re C.B.*, *supra*, 190 Cal.App.4th at p. 127.) As set forth *ante*, the juvenile court's relationship finding was supported by substantial evidence. (*Ibid.* [under the substantial evidence standard we view the record in the light most favorable to the juvenile court's order even if other evidence supports a contrary conclusion].)

Next, Mother contends the juvenile court erred because instead of considering the benefit to the children of continuing the relationship with Mother, the juvenile court

36

instead considered whether Mother occupied a parental role in the children's lives. Mother asserts the juvenile court erred by relying on this improper factor.

As set forth *ante*, when the juvenile court explained its reasoning, the court said, "I think, also for the purpose of the record in terms of the best interest prong fo[r] the children and *the beneficial relationship*, the social worker's testimony, which I also find credible in terms of the children's state in their current prospective adoptive homes, I think the children are being very well cared for. [¶] It sounds like the prospective adoptive parents are very proactive in engaging in the services needed for the children and seeking out those services and committing to the permanency of the children. And, it does appear from this court's perspective, that the love and commitment to those children does not [*sic*] outweigh *the parents' relationship* the biological parents that is." (Italics added.)

The juvenile court explicitly said it was weighing "the parents' relationship" with the children against the well-being the children could achieve in their prospective adoptive homes. Given this explicit wording concerning the parents' relationships with the children, we are not persuaded the juvenile court disregarded the relationship factor.

Next, the juvenile court said, "Parents must occupy a parental role . . . not [be] just a friendly visitor." The court found Mother was more of a friendly visitor. The law provides that for the parent-child bond "'exception to apply, the emotional attachment between the child and parent must be that of [a] parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' [Citation.]" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.) Given this law, the juvenile court was

required to consider whether Mother occupied a parental role in the children's lives, as opposed to being merely a friend to the children.  Accordingly, we conclude the juvenile court properly considered whether Mother had a parent-child relationship with the children.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

KING
J.